626 F.2d 959

**WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY to the use and benefit of Head Construction Company**

v.

**MERGENTIME CORPORATION et al., Appellants, (two cases).**

**Nos. 79–1545, 79–1628.**

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 15, 1979.

Decided March 12, 1980.

Rehearing Denied May 15, 1980.

---

Daniel Webster Coon, Rockville, Md., with whom Dawn White, Rockville, Md., was on the brief, for appellants.

Edgar T. Bellinger, Washington, D. C., with whom John C. Hayes, Jr. and Leslie M. Shulman, Washington, D. C., were on the brief, for appellee, Head Const. Co.

Before McGOWAN and MacKINNON, Circuit Judges, and PRATT,* United States District Judge for the District of Columbia.

Opinion for the Court filed by Circuit Judge MacKINNON.

MacKINNON, Circuit Judge.

The Head Construction Company [hereafter Head], sued a joint venture of the Mergentime Corporation and P&Z Co., Inc., [hereafter Mergentime], and its surety the Federal Insurance Company [hereafter Insurance Company], alleging that Mergentime owes it an unpaid balance of $99,597.65 (J.A. 7) on their subcontract whereby Head undertook to finish the segment of the Metropolitan subway that Mergentime had agreed to construct in its prime contract with the Washington Metropolitan Area Transit Authority [hereafter Transit Authority or owner]. Mergentime is withholding the claimed sum on the ground that it is a valid set off for part of the cost of insurance which, under the subcontract, Head was obligated to procure but refused to do so and Mergentime was therefore required to purchase the insurance. That Mergentime is withholding the sum sued for is not in dispute.[1] The case is determined by the interpretation of the relevant contracts.

I.

The controversy in this case involves the construction of the subcontract

---

* Sitting by designation pursuant to 28 U.S.C. § 292(a).

1. Mergentime alleges that it was required to pay $104,306.76 for the necessary insurance, that it withheld $95,671.63, and that Head owes it $8,635.13. (J.A. 10).

between Head and Mergentime. Under general contract law, the plain and unambiguous meaning of an instrument is controlling, *Vogel v. Tenneco Oil Co.*, 465 F.2d 563, 565 (D.C.Cir.1972), and the Court determines the intention of the parties from the language used by the parties to express their agreement. *E. P. Hinkel & Co., Inc. v. Manhattan Co.*, 506 F.2d 201, 204 (D.C. Cir.1974). In performing this task, the Court should construe the contract as a whole so as to give meaning to all of the express terms. *California Pacific Bank v. Small Business Administration*, 557 F.2d 218, 223 (9th Cir. 1977). Finally, the question of interpreting the plain language of a contract is a question of law for the Court, *Clayman v. Goodman Properties, Inc.*, 518 F.2d 1026, 1034 (D.C.Cir.1973); *Framlau Corp. v. United States*, 568 F.2d 687, 691 n.10 (Ct.Cl.1977), and appellate courts are not limited to the clearly erroneous standard of review unless extrinsic evidence was utilized. *Thornton v. Bean Contracting Co.*, 592 F.2d 1287, 1290 (5th Cir. 1979).

We find it unnecessary to go beyond the clear and plain wording of the contracts in this case. Upon a de novo review of their language and all their parts, we hold that the district court interpreted the Subcontract incorrectly, and that decision is reversed.

## II.

The following is a detailed description and analysis of the pertinent parts of the contracts in this case.

*Mergentime's Construction Contract with the Transit Authority.*

In 1971 Mergentime entered into a contract with the Transit Authority, the "owner" of the project, for the construction of a portion of the subway rail system for the metropolitan area of the District of Columbia. The terms of the contract with the Transit Authority designated Mergentime as the "general contractor", and therein Mergentime obligated itself to the Tran-

sit Authority to complete the entire portion of the segment of the project covered by their contract. In return the Transit Authority agreed to pay Mergentime from time to time as the construction progressed.

*Mergentime's Management Contract with Head.*

On June 17, 1971, Mergentime executed a management contract with Head under which the entire remainder of the work, required of Mergentime under its contract with the Transit Authority, would be under the coordination and supervision of Head. However, since Head had only undertaken a management contract, Mergentime remained directly liable to the Transit Authority for all obligations under the prime contract. Consistent with the undertaking between the parties that the prime contract created, the Transit Authority made all progress payments to Mergentime as the work progressed.

*Mergentime's Subcontract with Head for Completion of the Construction.*

On August 28, 1973, after 2 years of operations under the management contract, Mergentime and Head entered into a second agreement termed a "Subcontract" [hereafter Second Contract]. Under the terms of this Second Contract the parties agreed to: "cancel and . . . terminate the previous Management Agreement between them, and . . . [the] Subcontract [Second Contract] supersede[d] the prior Management Agreement to the end that *the remaining work to be performed under such general contract shall be performed by the Subcontractor [Head] under the terms and conditions of this Subcontract.*" (J.A. 12–13) (Emphasis added).

In other words, under the Subcontract Head became in effect the prime contractor except that the Transit Authority still looked to Mergentime as the party responsible to it for the completion of the railway segment.[2] The second agreement termed

---

2. The Memorandum Order of the District Court denies that "the general thrust of the subcontract was to have Head take over all of [Mer-

gentime's] responsibilities under the prime contract", but that was its plain intent. (J.A. 54)

Mergentime and Head, the "Contractor" and "Subcontractor" respectively (J.A. 12). Among its terms and conditions, Head agreed in section 4(f) to "keep harmless and indemnify" Mergentime and the Transit Authority against certain claims as follows:

> Sec. 4(f) In accordance with Article 2.13 of the Special Conditions of Specification No. 1FB–C–15 of the Prime Contract, it is agreed that the *Subcontractor* [Head] shall *save and keep harmless and indemnify* the *Contractor* [Mergentime] *and the Owner* [Transit Authority] *against any and all liability claims*, and the costs of whatsoever kind and nature arising or alleged to arise for injury, including personal injury to or death of any person or persons, and for loss or damage to any property, occurring in connection with or in any way incident to or arising out of the occupancy, use, service, operations, or performance of work in connection with this contract, resulting in whole or in part from the negligent acts, errors or omissions of the Subcontractor [Head] or any employee, agent or representative of the Subcontractor [Head] *regardless of whether or not the Owner [Transit Authority] or the Contractor [Mergentime], their directors, officers, agents, or employees · may be contributorily negligent in their actions causing such claims.* (J.A. 18) (Emphasis added).

It is significant that in this part of the Second Contract Head undertakes to "indemnify" Mergentime and the Transit Authority "against *any and all* liability claims . . . ." *Id.* In addition, he agrees to indemnify Mergentime and the Transit Au-

thority not only for the "negligent acts . . . of [Head and his] employees, but he also assumes all the liability of Mergentime and the Transit Authority even though "the Owner [Transit Authority] or the Contractor [Mergentime], their directors, officers, agents, or employees, may be *contributorily negligent* in their actions causing such claims." *Id.* (Emphasis added). So if Head just insured his own direct risks as Subcontractor on the project he would not be protected by insurance covering the risks of the "Owner" (Transit Authority) and "Contractor" (Mergentime) that Head agreed to "indemnify" in Section 4(f) of the Subcontract.

In the next section, 4(g), Head in essence agreed to provide insurance policies to protect the Transit Authority and Mergentime against liability from the risks it had generally agreed to indemnify, which are referred to [3] and more particularly described in Article 2.13 of the Prime Contract:

> Sec. 4(g) The Subcontractor [Head] shall procure and maintain, at its own expense, *the policies of insurance required by said Article 2.13* [4] of the Special Conditions, which article is incorporated herein by reference.[5] Such policies of insurance shall include Contractor's [Mergentime's] comprehensive general liability insurance, including contractual obligations, workmen's compensation, automobile liability insurance, protective liability insurance, and railroad protective insurance, covering the *risks described and for the face amount of the policies as specified in Article 2.13 above.* (J.A. 18) (Emphasis added).

---

**3.** Reference in a contract to extraneous writings renders them part of the agreement for the indicated purposes. *Maryland-National Capital Park and Planning Commission v. Lynn*, 514 F.2d 829, 833 (D.C.Cir.1975). Thus, we may look in depth into the wording of Article 2.13.

**4.** This does *not* say that Head shall procure *only* those policies of insurance required of subcontractors as specified by said Article 2.13(f). The statement in the Second Contract that Head "shall procure and maintain, *at its own expense*, the policies required by Article 2.13 . . . ." (emphasis added) is a clear

indication that the policies are *not* to be limited to covering Head's own risks. If the insurance policies were to insure only Head's own risks he would normally bear such expense and it would be highly unusual in such case for a contract to provide that the cost of the policies would be at his [Head's] own expense. This provision is thus another indication that the contract intended Head to carry insurance for some other party.

**5.** See Appendix.

Since Article 2.13 is part of the prime contract, and describes the insurance requirements of the parties to that contract,[6] it is clear that Head undertook in the Second Contract to procure the same insurance policies that Mergentime had been required to furnish and in addition to cover the "Contractor's [Mergentime's] . . . liability, etc. . . ." *Id.*

As set forth above, the Second Contract specifically requires that "such policies of insurance shall include *Contractor's* [Mergentime's] comprehensive liability insurance, including [those specified policies] . . . covering the risks described and the face amount of the policies as specified in Article 2.13." (Emphasis added). In the Second Contract "Contractor" by definition means *Mergentime* and the capitalization of "Contractor's" indicates that a specific contractor [Mergentime] is being referred to and not "contractors" generally.[7]

The terms of the Second Contract are also conclusive on the principal issue here, i. e., that Head agreed to "procure and maintain, at its own expense, *the policies of insurance required by said Article 2.13. . . .*" (Emphasis added). This means the exact policies that 2.13 requires Mergentime to procure and maintain. Head as a "subcontractor" under Article 2.13 of the prime contract had also been required under Article 2.13(f) "to carry the insurance coverages required herein . . .",[8] i. e., the insurance required of subcontractors. Thus by the Second Contract Head agreed to carry all the policies that Mergentime was required to carry as well as covering Mergentime and Head (as subcontractor) for all the "risks described and for the amounts specified in Article 2.13. . . ."

The "risks described . . . as specified in Article 2.13 . . ." are all *risks* that the contractor "Mergentime" had undertaken to cover. (J.A. 18). The breadth of Head's potential liability which flows from the "keep harmless and indemnify" provision that Head agreed to in the Second Contract, applicable as it is to the "Contractor" [Mergentime] and the "Owner" [Transit Authority], would expose Head individually to millions of dollars of unprotected risks if he did not take out insurance covering Mergentime and the Transit Authority for their risks that he had undertaken to indemnify. In this respect the quoted provisions in Section 4(f) and (g) bear the same relationship to each other as do Section 2.13(a) and (b) of the Special Conditions in the prime contract. (J.A. 65–67, and see Appendix). In fact, the terms of Section 4(f) and (g) practically track the terms of Section 2.13(a) and (b) except that 4(f) and (g) add Mergentime as an additional insured that Head agreed to cover. When the parallel provisions of the prime contract and the Second Contract are compared it becomes crystal clear that the intent and purpose of Sections 4(f) and (g) of the Second Contract was merely to pass on to Head the exact same insurance obligations that Mergentime as the performing contractor had agreed to assume in the prime contract and to add Mergentime as an additional insured.[9] That Head was becoming

---

6. *Id.*

7. In addition, Article 2.13(b)(2) capitalizes the first letter of each word in the phrase "Contractor's Comprehensive General Liability Insurance", indicating that the drafters considered this a specific kind of insurance to be obtained by the parties to the prime contract. In contrast, the drafters of the Second Contract use lower case letters, thus referring to a more general kind of insurance liability of Mergentime's.

8. See Appendix, Article 2.13(f).

9. Other provisions in the Second Contract indicate that Head is taking over the entire contract, except that the Transit Authority looked directly to Mergentime as the party responsible for completing the designated construction. One such provision occurs in Section I:

". . . the Subcontractor [Head] *assumes,* for the completion of the work covered by this Agreement, all obligations and responsibilities placed upon the Contractor [Mergentime] by the aforesaid 'Contract Documents' which said Contractor [Mergentime] has assumed toward the owner." (J.A. 13) (Emphasis added).

Part of the "obligations and responsibilities [in the] . . . Contract Documents" referred to include the insurance policy obligations required by the "General and Special Conditions . . . forming, or by reference made a part of, the contract between the Contractor [Mergentime] and the Owner [Transit Authority]." (J.A. 13. *See also* J.A. 17)

the performing contractor in all practical respects is further reflected by the fact that Mergentime agreed in the Subcontract that Head was entitled to all the "remaining money due under the Contract with the Owner [Transit Authority]", except payments for prior work. Section 10 (J.A. 20).

There is further support for interpreting the Second Contract as requiring Head to take out insurance policies for other parties. When Head contracted with Mergentime to procure and maintain insurance policies of the kind and covering the risks specified in Article 2.13 of the Prime Contract, that obligation included Article 2.13(b)(4) which requires a policy described as follows: "A Protective Liability Insurance Policy issued to and *covering the liability of the [Transit] Authority* . . . [etc., and the liability of the] District of Columbia" where required by the General Agreement. This indicates that Head's insurance obligations, specified as they were in Section 4(g) and Article 2.13, extended beyond an obligation only to insure himself as a normal subcontractor.

### III.

We thus find that Head did not comply with Section 4(g) of the Second Contract when he covered only his *individual risk* with insurance policies of the type and amounts described in Article 2.13 of the prime contract. In that contract Head, in effect, became the prime contractor, in everything except being recognized by the Transit Authority as replacing Mergentime, for the completion of the remaining segment of the subway to which the contract applied.

In sum, the contract between Head and Mergentime required Head to "procure and maintain at [Head's] expense [all] the policies of insurance required by Article 2.13 . . . covering the *risks described* . . *in Article 2.13.*" Reference to Article 2.13, and to the "risks described", clearly indicates that the parties were referring to the *risks specified* in Sec. 2.13 of the Prime Contract, to which the "Owner" [Transit

Authority], the "Contractor" [Mergentime], and persons referred to as Subcontractors in the prime contract, were potentially liable. It is their risks, as well as the risks of Head as the performing contractor (subcontractor), that are described and are required to be covered by insurance policies procured at Head's expense. Therefore Head did not fully comply with Section 4(g) of his contract with Mergentime when he took out insurance policies of the required amounts and types that covered *only* the risks he incurred in his personal performance as a subcontractor.

Because of Head's refusal to furnish the insurance policies required by the Second Contract, Mergentime is entitled to keep the sums it has retained to compensate it for procuring the insurance Head failed to provide, and Head is obligated to pay Mergentime such additional sum as may be necessary to completely compensate Mergentime for the insurance it supplied due to Head's default. The judgment of the district court is therefore vacated and the case is remanded with instructions to enter judgment in accordance with this opinion.

*Judgment accordingly.*

### APPENDIX

### TABLE OF CONTENTS

### SECTION 2

### SPECIAL CONDITIONS

2.13  INDEMNIFICATION AND INSURANCE

(a)  The Contractor shall save and keep harmless and indemnify the Authority against any and all liability claims, and the costs of whatsoever kind and nature arising or alleged to arise for injury, including personal injury to or death of any person or persons, and for loss or damage to any property; occurring in connection with or in any way incident to or arising out of the occupancy, use, service, operations, or performance of work in connection with this

contract, resulting in whole or in part from the negligent acts, errors or omissions of the Contractor, any subcontractor, or any employee, agent or representative of the Contractor or subcontractor; regardless of whether or not the Authority, its directors, officers, agents, or employees may be contributorily negligent in their actions causing such claim(s).

(b) The Contractor shall procure and maintain, at his own cost and expense, during the entire period of the performance under this contract, the following types of insurance:

(1) *Workmens' Compensation* —A policy complying with the requirements of the Statutes of the District of Columbia, and if there is an exposure by any of the Contractor's Personnel—U. S. Longshoremen's & Harborworkers' Act, Jones Act or Admiralty Laws and Federal Employers' Liability Act. The policy limit for Employers' Liability shall be not less than $250,000.00.

(2) *Contractor's Comprehensive General Liability Insurance* —A standard (10/66 Ed.) Comprehensive General Liability Insurance Policy or its equivalent or better issued to and covering the liability of the Contractor for all work and operations under or in connection with the contract and all obligations assumed by the Contractor under this contract. This included obligation to hold harmless the Transit Authority.

The coverage under such an insurance policy, or policies, shall have not less than the following limits:

PERSONAL INJURY LIABILITY
$ 300,000 Each person
 5,000,000 Each occurrence
 5,000,000 Annual aggregate.

PROPERTY DAMAGE LIABILITY
$ 1,000,000 Each occurrence
 10,000,000 Annual Aggregate

(3) *Automobile Liability Insurance* —An insurance policy covering the use of all owned, non-owned, hired, rented or leased vehicles bearing, or, under the circumstances under which they are being used required by the Motor Vehicle Laws of the District of Columbia, to bear license plates and not covered under the Contractor's Comprehensive General Liability Insurance aforementioned. The coverage under such policy, or policies, shall have not less than the following limits:

BODILY INJURY LIABILITY
$1,000,000 Each person
 5,000,000 Each accident

PROPERTY DAMAGE LIABILITY
$1,000,000 Each Accident

(4) *Protective Liability Insurance* —A Protective Liability Insurance Policy issued to and covering the liability of the Authority, its engineering and general architectural consultants, its technical inspection forces, District of Columbia, and their directors, officers, representatives, agents and employees, both officially and personally, including omissions and supervisory acts (exclude however, Architects and/or Engineer's design errors and omissions) with respect to all his subcontractors. Where required by General Agreement between the Authority and the District of Columbia such Protective Liability Insurance shall include District of Columbia as an additional assured. The coverage under such Protective Liability Policy shall have not less than the following limits:

PERSONAL INJURY LIABILITY
$ 300,000 Each person
 5,000,000 Each occurrence

PROPERTY DAMAGE LIABILITY
$ 5,000,000 Each occurrence
 10,000,000 Annual aggregate

(5) *Railroad Protective Insurance* —A policy providing insurance to the Washington Terminal Company, the C&O/B&O Railroad Company, the Pennsylvania & New York Central Transportation Company, and all other railroads operating on property owned by, or controlled by, the Washington Terminal Company. This policy shall be written under the standard railroad AAR–AASHO form and amendments thereto, and shall provide the following coverage:

(i) A Combined Single Limit of $2,000,000 per occurrence, Personal Injury and Property Damage Liability, with exclusion "d" of the 1958 AASHO–AAR form deleted.

(6) Other coverage as required by statute(s).

(c) Before the contract will be executed by the Authority, the Contractor shall forward to the Authority for approval a certificate, or certificates, of the insurance required under the foregoing provisions, including special endorsements. Such certificate(s) shall be in a form satisfactory to the Authority and shall list the various coverages and limits. In addition to any provisions hereinbefore required, a provision of such insurance policies shall be that the policies shall not be changed or cancelled, and they will be automatically renewed upon expiration and continued in full force and effect until final acceptance by the Authority of all the work covered by the Contract, unless the Authority is given thirty (30) days written notice before any change or a cancellation is made effective. The Contractor shall promptly furnish the Contracting Officer with a certified copy of each insurance policy.

(d) All insurance must be procured from insurance or indemnity companies acceptable to the [Transit] Authority and licensed and authorized to do business in the District of Columbia. Authority approval or failure to disapprove insurance furnished by the Contractor shall not release the Contractor of full responsibility for liability damage and accidents as set forth herein.

(e) If at any time the above required insurance policies should be cancelled, terminated or modified so that the insurance is not in full force and effect as required herein, the Contracting Officer may terminate this Contract for default or obtain insurance coverage equal to that required herein, the full cost of which shall be charged to the Contractor and deducted from any payments due to the Contractor.

(f) Each Contractor shall require his subcontractors, at all tiers, to carry the insurance coverages required herein and to provide evidence of such insurance as specified in 2.13(c). In compliance of the insurance requirements specified herein the Contractor may have, at his option, the insurance coverages required herein provided by the Contractor's insurer for all and/or any of his subcontractors at all levels, and if so elected by the Contractor the evidence of insurance submitted shall so stipulate.

(g) Any contract of insurance or indemnification naming the Authority, the United States of America or any of its departments, agencies, administrations or authorities, shall be endorsed to provide that the insurer will not contend in the event of any occurrence, accident, or claim that the Authority or the United States of America, et al., are not liable in tort by virtue of the fact of being governmental instrumentalities or public or quasi-public bodies.

(h) No separate payment will be made for providing insurance as prescribed herein but the cost thereof shall be included in the prices for the various items set forth in the Unit Price Schedule.