**MARYLAND–NATIONAL CAPITAL PARK AND PLANNING COMMISSION, Appellant,**

**v.**

**James T. LYNN, Secretary, Department of Housing and Urban Development.**

**No. 74–1327.**

United States Court of Appeals, District of Columbia Circuit.

Argued March 7, 1975.

Decided June 12, 1975.

Rehearing and Rehearing En Banc Denied July 15, 1975.

Sanford E. Wool, Silver Spring, Md., with whom Robert H. Levan, Riverdale, Md., was on the brief for appellant.

David E. Wilson, Asst. U. S. Atty., with whom Earl J. Silbert, U. S. Atty., and John A. Terry, Asst. U. S. Atty., were on the brief for appellee.

Before MacKINNON and ROBB, Circuit Judges, and CHRISTENSEN,* Senior District Judge for the District of Utah.

---

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

1. The memorandum decision stated that "An order in accordance with this Opinion will be entered as of this same date." On the same

**PER CURIAM:**

Appellant, Maryland-National Capital Park and Planning Commission (Commission), is an agency of the State of Maryland authorized to develop and maintain public parks within the Maryland-Washington Metropolitan District. It complained in the district court that the Secretary of the Department of Housing and Urban Development (HUD), appellee herein, had breached a preexisting grant-contract by his refusal to approve a proposed lease of a portion of "open-space" land purchased in part with grant funds furnished by HUD's predecessor, to enable a third party to construct and operate an indoor tennis facility through financial arrangements with the Commission. Declaratory relief and a mandatory injunction requiring approval by appellee of the proposed lease were sought by the Commission. The case was heard on the motion of each party for summary judgment. The district court denied appellant's motion, granted appellee's motion and in effect dismissed the action.[1] This appeal followed in due time.

Appellant contends here that the trial court erred in considering the denial of approval for the lease to be "within the scope of the Housing Act of 1961 as amended" rather than as controlled exclusively by the grant contract, in holding that amendments to that Act and certain administrative regulations thereafter promulgated should be "applied retroactively", and in determining on the administrative record that appellee did not act in an arbitrary or capricious manner or contrary to law. We have examined these contentions and believe them to be without merit.

The Housing Act of 1961 as it existed when the grant contract was entered into, Pub.L. No. 87–70, June 30, 1961, 75 Stat. 149, contained among other provisions Title VII, dealing with "Open

day an order was filed denying the plaintiff's motion for summary judgment, granting defendant's motion and further ordering "that the action be removed from the Court's docket". We treat this disposition as a final order for purposes of this appeal, as did the parties.

Space Land". Through a program of assistance to state and local public bodies acting in accordance with comprehensive area plans, the acquisition and preservation of open-space land in urban areas thereby were to be fostered. The Housing and Home Finance Administrator, to whose powers the appellee Secretary succeeded, was authorized to contract to make grants to certain state and local bodies of up to 30% of the acquisition cost of such land. The term "open-space land" was defined in the Act as "any undeveloped or predominantly undeveloped land in an urban area which has value for (A) park and recreational purposes, (B) conservation of land and other natural resources, or (C) historic or scenic purposes."

The contract with which this case is concerned, dated August 22, 1963, is entitled "Contract for Grant to Acquire Open-Space Land Under Title VII of the Housing Act of 1961," and provided for a contribution by the government of 30% of the acquisition cost of a large area of land later purchased at a total cost of about $7,000,000.

The grant contract provided in part:

"Sec. 110. *Special Provisions Relating to Sale or Lease of Land.*—If the Program proposes that the Public Body lease or sell all or part of the land, the Public Body must first obtain written approval of the Administrator before such leasing or sale is undertaken. Approval will be given only if such leasing or sale is consistent with the Program and adequate controls are embodied in the lease or deed to assure the preservation of the open-space use or uses of such land as set out in Section 2(b) of Part 1 of this Contract."

Section 2(b) reads as follows:

"(b) The Public Body agrees to retain said land for permanent open-space purposes, and the open-space uses of said land shall be:

"Park and outdoor recreation activities and uses compatible with maintaining the open-space character of the

lands involved; conservation purposes."

The contract also contains the following provision:

"Sec. 111. *Use of Land.*—

"(c) The Public Body shall not restrict the use of the land on the basis of race, creed, color, national origin, or place of residence, except that a reasonable fee charged nonresidents over and above any fee that may be charged residents shall not be interpreted as a restriction of the use of the land."

Supporting appellee's motion for summary judgment there is an uncontroverted affidavit of a HUD official familiar with the policy statements and "criteria utilized by the Department of Housing and Urban Development, and its predecessor, in approving and disapproving applications by Public Bodies for initial grants, transfers of interests, and conversions for public use under the applicable Open Space Law," stating among other things:

"5. The Department of Housing and Urban Development has consistently construed the Open Space provisions of the applicable law to place a high priority of the factor of general public accessibility to the land or facility to be acquired when considering an application or subsequent change or modification to the originally intended use of an already approved project. While program regulations have consistently allowed for the charging of reasonable user fees, to my knowledge, the Department has never concurred in any fee schedule or arrangement which would give increased accessibility or preference to a limited segment of the population on the basis of a regular subscription."

On August 25, 1972, the appellant wrote a letter to HUD requesting approval of a proposed 20-year lease of one acre of land for the purposes of the

projected indoor tennis facility.[2] A schedule of fees for the use of the facility by the public was enclosed. Varying for week-ends and according to times of day, proposed court fees ranged from $180 (minimal seasonal rate) to $300 (maximum seasonal rate), and from $8 to $12 per hour[3] for non-season spot fee rates.

The Area Director of HUD on September 8, 1972, denied the request for approval of the lease on the ground that the submitted fees would unduly restrict the use of the facility.[4] Appellant's request for reconsideration, which insisted upon the fee schedule as essential to the project,[5] was denied by HUD on the statement:

2. The letter in part stated:

"The need for this facility became apparent several years ago as a result of requests from various segments of the population in Prince George's County. Subsequently we received several petitions, one of which was signed by 900 persons, requesting this facility.

"As you can see from the proposed lease agreement and fee schedule, the indoor facility will operate for a 30-week season. There is no membership fee. One of the six courts will be a public court on which will be allowed 123 hours of spot play per week.

"The facility was located at Watkins Regional Park because of easy access via Enterprise Road and to make it within easy driving distance for the largest majority of residents of Prince George's County. The building will be located next to existing parking (as shown on the enclosed site plan)."

3. The leased premises were to be one acre of land forming a part of the Robert M. Watkins Regional Park. The proposed lessee was Metro Tennis Limited Partnership, which would undertake to construct, operate and maintain an indoor tennis court, consisting of a minimum of six regulation size courts, necessary restrooms, lockers, shower facilities, pro shop, office, lounge and vending machine area. The lease would allow Metro Tennis to rent court time to groups or individuals on either a seasonal basis, i. e., the same period for each week for the full 30-week season contemplated (October to April), or on an hourly basis, referred to as "Spot Play Time". It was assumed that one court likely would be utilized for spot play and the remaining five courts for seasonal scheduling.

4. "This letter is in response to your recent request for HUD approval of a transfer of in-

"Land acquired with Open Space program funds must be made and kept available to the entire community without restriction. We have consulted with our Regional and Central Offices, and have been unable to locate established precedent for approving your request.

"We understand that the Commission has an alternate site available for the tennis facility which does not involve Federally-assisted land. We would suggest that you pursue this course since we are unable to approve this transfer of interest."

█ We are of the opinion that the district court did not err in upholding the administrative decision. That deci-

terest for construction and operation of an indoor tennis facility on parkland acquired with Federal assistance.

"Program regulations governing transfers of interest provide that they be approved only when 'continued public use, in no way restricted' is assured. The proposed fee schedule will restrict the use of the facility, and therefore the land, because it would make the facility inaccessible to many families within the service area. We are, therefore, unable to approve this request for a transfer of interest."

5. The request for reconsideration, dated September 27, 1972, stated in part:

"The kind of facility contemplated by the lease arrangement for Watkins is one which would simply not be provided if we were to rely solely on tax revenues. Those revenues are, and must be, dedicated to providing more fundamental park and recreation services. Indoor tennis courts are a luxury both from the point of view of development and operation, and the only way they can be developed and made available to as broad a segment as possible is by doing it in the manner reflected by this lease arrangement. The simple fact is that no one is being deprived of any facility at all, since all of the tax monies available are being spent to develop services which are available to all. A new facility is contemplated which will make tennis available to all residents of the area on a 12-month basis, and if some people will be deprived because of the level of fees involved, other [sic] who have never had access to the private facilities which charge much higher fees, will have year round access to this form of recreation. The public body will own the facility at the end of the lease period."

sion was not irrational; it was within the authority vested in the Secretary by the grant contract. Reasonable public accessibility to all of the land thereby covered was a condition to be implied almost inescapably from its purpose and terms in light of the law. It was not unreasonable or arbitrary for HUD to regard the financial requirements for use by the public as not consistent with the program. Section 2(b) of the grant contract, *supra*, to the effect that the permanent open-space use of the land shall be "[p]ark and outdoor recreation activities and uses . . ." furnishes a premise supporting the agency's determination that preclusive financial requirements superimposed upon a non-conforming use rendered the project objectionable. Appellant's argument that regulations promulgated by the agency following the execution of the grant contract recognized that approval of limited structures would not be necessarily inconsistent with the open-space program, ignores the cumulative objection to the financial limitation of use by the public. The determination that the proposed facility essentially based upon the submitted fee schedule would be unduly preclusive and limiting was entitled to deference by the court.

 Consideration by the court of the Housing Act of 1961 in construing the Secretary's authority was proper. It is a general rule that reference in a contract to extraneous writings renders them part of the agreement for indicated purposes; but even more pervasively it is to be accepted that laws which subsist at the time and place of the making of a contract and where it is to be performed enter into and form a part of it as if they were expressly referred to or incorporated in its terms. Wood v. Lovett, 313 U.S. 362, 61 S.Ct. 983, 85 L.Ed. 1404 (1941). See also

Home Building & Loan Ass'n v. Blaisdell, 290 U.S. 398, 54 S.Ct. 231, 78 L.Ed. 413 (1934); Rehart v. Clark, 448 F.2d 170 (9th Cir. 1971).

We are mindful that the district court found additional support for its conclusion in HUD regulations promulgated after execution of the Grant Contract. 36 Fed.Reg. 24725, 24726 (Dec. 22, 1971), 24 C.F.R. § 540.250(e)(1) (1973). The intervening 1970 amendments to the Housing Act, Pub.L. No. 91–609, had elaborated upon the initial congressional findings and purpose, but we do not consider this and other changes to be significant in the instant context. Nor do we believe that the elaboration of policy reflected in the 1971 regulations altered substantially that which was implicit in the existing law and reflected by the grant contract.

 Appellant argues, in misplaced reliance upon Lynch v. United States, 292 U.S. 571, 54 S.Ct. 840, 78 L.Ed. 1434 (1934), that the 1971 regulation which the district court cited to demonstrate that approval of the lease would have been unlawful at the time, deprived appellant of a contractual property right in violation of the Due Process Clause of the Fifth Amendment. The basic decision did not hinge upon the 1971 regulation, although its consideration under the circumstances was not improper.[6] Thorpe v. Housing Authority, 393 U.S. 268, 89 S.Ct. 518, 21 L.Ed.2d 474 (1969). Cf. Home Building & Loan Ass'n v. Blaisdell, 290 U.S. 398, 54 S.Ct. 231, 78 L.Ed. 413 (1934), *supra*. As in *Thorpe*, the general policy reflected in the new regulation was implicit in the preexisting law. Moreover, as already noted in the margin there was before the court an uncontroverted affidavit indicating that HUD's policy in the past consistently had been supportive of the rejection of

6. The court stated: "There is one other factor which should not be overlooked. Had the Defendant approved the lease based upon the Plaintiff's showing, the Defendant's action would *not* have been in accordance with law. Recent HUD regulations governing the Open Space program, in particular § 540.250(e)(1), specify that the Secretary will approve a long-term transfer (over three years) only in unique or exceptional circumstances and then only when the transfered [sic] use would provide a greater benefit to the community than did the original use. *See* 36 Fed.Reg. 24725, 24726 (December 22, 1971)."

the lease for the reason stated. Such construction was entitled to weight. Trafficante v. Metropolitan Life Ins., 409 U.S. 205, 210, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972).

Holding that judicial review was available contrary to the contention appellee then made, the trial court applied the limited criteria held applicable to informal agency action in Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). It accordingly determined that the decision in question complied with constitutional, statutory and procedural requirements, was not arbitrary, capricious or an abuse of discretion and was in harmony with law. We agree.

Appellant's claim to the contrary is premised also on the contention that the Agency had insufficient evidence before it to support a decision and that in any event it was required to make formal findings of fact on the basis of substantial evidence in accordance with 5 U.S.C. § 554.

■ As to the first point, there is a judicial presumption of the validity of administrative action and the burden was on the Commission to overcome that presumption. Udall v. Washington, Virginia and Maryland Coach Co., 130 U.S. App.D.C. 171, 398 F.2d 765 (1968), cert. denied, 393 U.S. 1017, 89 S.Ct. 620, 21 L.Ed.2d 561 (1969). No affidavits were filed or other showing made to the contrary. The existing record was sufficient to warrant the decision.

■ With reference to the second point, it is to be observed that there is no requirement in the contract or in the Housing Act for "adjudication . . . on the record after opportunity for an agency hearing" concerning approval or rejection of the leasing of open-space land. Thus 5 U.S.C. § 706, exclusive of subsections (2)(E) and (F), rather than § 554 applies. Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), *supra*. Cf. Schicke v. Romney, 474 F.2d 309 (2d Cir. 1973), where approval of a change in the use of open-space land was held unsupported by a record which failed to show that the Secretary had followed the statutory mandate in certifying that the proposed conversion-substitution was consistent with any comprehensive plan of the city involved.

In the present case it is quite evident that no statutory mandate was disregarded. On the contrary, the administrative decision to deny approval of the proposed lease was rationally founded and consistent with the grant contract and the authorizing statute referred to therein.

Affirmed.