BUSCH DEVELOPMENT, INC.,
Appellant (Defendant and
Third-Party Plaintiff),

v.

CITY OF CHEYENNE, Cheyenne-Laramie County Regional Planning Commission, Appellees (Plaintiffs and Counter-defendants),

and

Pacific Cascade Corporation, a Washington corporation, and The Lane Company, a Washington Limited Partnership, by and through Joseph C. Lane, Jr., its General Partner, Appellees (Plaintiffs),

and

Douglas R. Hendel, Deborah L. Hendel, Douglas S. Gamble, Jane B. Gamble, William D. Hofius and Martha Ann Hofius, Appellees (Third-Party Defendants).

No. 5639.

Supreme Court of Wyoming.

May 20, 1982.

W. Douglas Hickey and Glenn Parker of Hirst & Applegate, Cheyenne, for appellant.

Gina Guy of Guy, Williams, White & Argeris, Cheyenne, and F. Ross Boundy of Shidler, McBroom, Gates & Baldwin, Seattle, for appellees Pac. Cascade Corp. and the Lane Co.

Bernard R. Pitts, Asst. City Atty., Cheyenne, for appellees City of Cheyenne and Cheyenne-Laramie County Regional Planning Com'n.

No appearance was made on behalf of appellees Douglas R. Hendel, Deborah L. Hendel, Douglas S. Gamble, Jane B. Gamble, William D. Hofius and Martha Ann Hofius.

Before ROSE, C. J., and RAPER, THOMAS, ROONEY and BROWN, JJ.

BROWN, Justice.

This case involves a dispute over a sale of real property in the development of a shopping center. Appellees Pacific Cascade Corporation (Pacific) and the Lane Company (Lane) sued appellant Busch Development Corporation (Busch), the City of Cheyenne (City), and various other defendants for the reimbursement of money for landscaping a berm portion of a shopping center. Busch counterclaimed seeking enforcement of a reciprocal easement agreement. Busch also filed a third-party complaint against Hendel and others (the Hendel group) as grantees of Pacific and Lane. The City cross-claimed against Busch for enforcement of an oral contract to install the landscaping in question. The case was tried to the court. Various causes of action and parties were dismissed, so that the court ruled on the following causes of action: Pacific and Lane's complaint against Busch; the City's cross-claim against Busch; Busch's counterclaim against Pacific and Lane; and Busch's third-party complaint against the Hendel group.

The trial court found that Pacific and Lane were responsible for only a portion of the landscaping and that Busch was responsible to the City for the berm landscaping. It also interpreted the reciprocal easement agreement.

We will affirm.

I

In 1976, Busch purchased land in Cheyenne to develop into a shopping center. As part of that development, it sold a tract of land to Pacific, by a letter agreement, real estate purchase agreement, and reciprocal easement agreement. Pacific constructed a LaBelle's store on the site of land it had purchased and then assigned the sales contract to Lane, which in turn sold the site to the Hendel group. The lender to the Hendel group demanded that the City grant a permanent certificate of occupancy to LaBelle's before it would lend any money. Lane went to the Cheyenne-Laramie County Regional Planning Commission (Commission) and requested a permanent certificate of occupancy, but before the Commission would grant one, it demanded that Lane guarantee that certain landscaping be installed. Lane paid funds into escrow under protest, contending that Busch was responsible for part of the landscaping costs, specifically for those in the berm area.

The tract which Busch purchased and developed was divided into four major portions:

Portion 1 comprised the area presently occupied by Albertson's supermarket and several other tenants. Busch later conveyed this portion to the Kroh Brothers. This site was referred to as the "BDI site" in the reciprocal easement agreement.

Busch sold a second portion of the tract to Pacific, which comprised approximately 1.38 acres, on which portion the LaBelle's building was constructed. This site was

referred to as the "PCC site" in the reciprocal easement agreement.

Busch still owns the third portion, which consists of the parking site adjacent to the LaBelle's store. This site was referred to as the "Parking Site" in the reciprocal easement agreement.

The fourth portion is the berm area, or outward perimeter surrounding the LaBelle's facility and the parking area. It is the source of the landscaping controversy. Appellees Lane and the City contend that Busch is responsible for the landscaping of this area; Busch says that Lane is responsible.

■ The trial court determined that Busch was responsible for landscaping the berm area because it had agreed with the City that it would do so. Busch contends that there is no basis in fact or law for granting a judgment to the City. We disagree. The evidence, taken in the light most favorable to the City, shows a written agreement by Busch to landscape the berm area.

■ A written agreement may consist of more than one document. *Allen v. Allen*, Wyo., 550 P.2d 1137 (1976). Here, the written agreement between the City and Busch consists of a series of letters, the first letter having been written on November 21, 1979, from Mr. Cliff Barber, project manager for Busch for the shopping center development, to Mr. Bonds, director of the planning office:

"This letter is to set forth my understanding of the events that have taken place regarding the P.U.D. revision for the two (2) pads on the side of the corner of Lincoln Highway and Ridge Road. "Busch Development, Inc. *does agree to the conditions* placed on the approval by the Planning Commission, including providing the City with a bond to perform the landscaping requirements. * * * " (Emphasis added.)

The next letter was one written by Barber to Bonds on November 23, 1979:

"This is to confirm our telephone conversation of today regarding Busch Development, Inc.'s commitment to place a bond in favor of the City for the completion of the landscaping on LaBelle's. * * * "

On December 6, 1979, Bonds wrote Barber a letter:

"The Planning Commission did approve the P. U. D. Revision for the LaBelles [sic] Site on November 19th, 1979. They attached the following conditions to their approval.

* * * * * *

"3. That the developer agrees to have all landscaping activities * * * completed on or before June 1, 1980. * * * "

■ Busch argues that the written instruments signed or exchanged between the parties are the sole basis for determination of the controversy, and that they cannot be varied by the oral testimony of the parties. The letters make it clear that Busch and the City had made an agreement concerning landscaping, but parol evidence was properly admitted, since the letters did not make it clear exactly what was to be landscaped. An ambiguous contract is one which is obscure in its meaning because one or more expressions are indefinite, or because they have a double meaning. *Amoco Production v. Stauffer Chemical*, Wyo., 612 P.2d 463 (1980). If the meaning of a contract provision, in this case the agreement concerning landscaping, is ambiguous or not readily apparent, resort may be had to competent evidence of extraneous circumstances tending to explain the ambiguity and illustrate the intention of the parties at the time the provision was adopted, as long as the evidence does not contradict, alter, add to, or vary the plain terms of the provision. *Goodman v. Kelly*, Wyo., 390 P.2d 244 (1964).

■ Here, we agree with the trial court on the question of law that an ambiguity did exist, and that parol evidence was therefore admissible. In such case, interpretation becomes a mixed question of law and fact. The question of whether an ambiguity existed is one of law. *Amoco Production v. Stauffer Chemical*, supra. The question of intent becomes one of fact. As

to the question of fact concerning intent, on appeal we must accept the trier's finding of fact as long as there exists a rational basis in the evidence for the conclusion. *Goodwin v. Upper Crust of Wyoming, Inc.*, Wyo., 624 P.2d 1192 (1981).

■ In giving effect to the intent of the parties, common sense and good faith are the leading characteristics of contract construction. *Marathon Oil Co. v. Kleppe*, 407 F.Supp. 1301 (D.C.Wyo.), affirmed 556 F.2d 982 (10th Cir. 1975). Here, the extraneous circumstances showed that Busch was trying to sell a portion of the land to Kroh Brothers. It also showed that Busch was seeking an amended PUD, a planned unit development designation which allows a developer to have mixed uses of land on a single parcel, from the Commission so that Busch could construct two buildings on the LaBelle's parking site. Common sense tells us it apparently told the trial court as finder of fact, that Busch, since it was the party who applied for the revised PUD and stood to benefit from it, agreed to do whatever landscaping the City said it should do. Indeed, the City did approve the placement of two buildings in the parking area. It performed its side of the contract, and reasonably expects that Busch will do the same.

The trial court also had Busch's admission that it agreed to landscape the berm area. In response to questioning at trial, Barber testified:

"Q: And on behalf of your employer, Busch Development, you agreed to those conditions, didn't you?

"A: Yes, that was part of what took place at the meeting."

Plaintiff's Exhibit 9, a letter from Barber to Bonds on November 21, 1979, concerned the extent of landscaping requirements. Mr. Barber was questioned about the letter and the landscaping requirements:

"Q: Now Exhibit 9 indicates that Busch Development does agree to the conditions placed on the approval of the Planning Commission, and including providing the City with a bond to perform the landscaping requirements. That included the bermed area, did it not?

"A: At that time there really wasn't any delineation made between the bermed area or the interior area or anything. In other words what was placed on me was simply the landscaping requirements that the City commission felt had not been done prior."

Bonds testified that when Busch was presenting the information to help the Kroh Brothers with the necessary mapping and other things to be submitted for approval, Busch indicated that it had the responsibility for the bermed areas and the parking lot.

■ The site plans submitted by Busch to the Commission were also admissible as evidence to show the extent of the landscaping which Busch promised to perform, and to show the extent of the landscaping which Busch felt it was obligated to perform from the inception of its contract with Pacific. On March 3, 1978, Busch prepared a site plan for LaBelle's showroom, incorporated into the purchase agreement between Busch and Pacific. Note 5 on the site plan says that landscaping and planting for the "LaBelle's" project is to be furnished and installed by Pacific Cascade Corporation. Note 3 on the site plan says that the shaded area is the "LaBelle's" site. The shaded area does not include the berm area, indicating that Pacific was not to be responsible for landscaping it.

On April 6, 1978, Pacific presented a landscaping plan to the Commission for its portion of the landscaping. The plan did not show landscaping in the berm area. On June 1, 1978, Busch Terracon, Inc., apparently a subsidiary of Busch Development, Inc., prepared a landscape plan showing landscaping in the berm area. It also referred to the site plan to show the mounding in that area. On June 5, 1978, the council approved the revised preliminary site plan showing the location of bushes and shrubs in the berm area. This plan was drawn by Busch Terracon. The minutes of the Commission meeting say " * * * extra landscaping had been required by the planning office and has been accepted by the developers."

Busch also implies here that its agreement with the City to landscape was not voluntary and that it agreed only to facilitate its negotiations with Kroh Brothers. The fact remains, however, that Busch prepared the application for an amended PUD, and that Busch was seeking on its own to have the Commission approve the installation of two buildings in the LaBelle's parking lot. Busch, in addition to trying to complete its sale to Kroh Brothers, was seeking Commission approval for its own project. It would benefit in two ways from the approval of the amended PUD, so that its implication that it was acting only at the behest of Kroh Brothers does not carry much weight. Busch voluntarily agreed through its agent Barber to do the landscaping. There is no indication on the record that Busch protested the requirement imposed by the Commission at the time it was imposed. The City promised to allow Busch a revised PUD; Busch promised to provide landscaping. The City and Busch made mutual promises, with neither of them acting under duress as to their individual promises.

Busch next argues that Lane agreed with the City to do the landscaping and that Busch should, therefore, not be responsible. Lane did agree to landscape the berm area, an agreement which it made under protest, as reflected in the Commission minutes of April 7, 1980. The Lane Company appeared before the Commission to get its permanent certificate of occupancy nearly four months after Busch had agreed to do the landscaping. It stated that it had installed landscaping on the parking site, but that it had been destroyed in the winter. It agreed to relandscape the parking site, which it has since done. Lane also presented its position that Busch, as applicant for the amended PUD, should be responsible for any extra landscaping. The Commission decided it would not issue a certificate of occupancy until the landscaping was guaranteed, at which time Lane agreed under protest to deposit the money in escrow.

■■ Considering the evidence in the light most favorable to the City, there is no question that both Busch and Lane agreed with the City to provide the landscaping, as they both wanted something in return. There is also no question that Busch first agreed to the obligation, including the bermed area. Busch implies that there is something unfair about the City deciding to pursue only Busch on the claim. We know of no rule of law making such a statement, and Busch cites none. The City was trying to make sure that someone, whether it was Busch or Lane, would see that the landscaping was installed. Lane did perform its obligation to landscape and relandscape the parking site itself, and the City was apparently satisfied with that. Busch is therefore still responsible to the City for the landscaping of the berm area in the amount ordered in the judgment, which amount reflects a deduction for landscaping that has already been provided by Lane on the parking lot.

As to a written agreement between Busch and Pacific, Busch argues that Pacific assumed the landscaping obligation for the berm area, and that the writings by the two parties conclusively demonstrate such an obligation. The writings between the parties consist of a letter agreement, a real property purchase and sale agreement, and a reciprocal easement agreement.

■■ The letter agreement dated February 22, 1978, provided:

"Additionally, a proportionate share of site improvements related to compliance with the PUD designation of the property directly related to or affecting the subject property shall be borne by Pacific Cascade."

Busch argues that this clearly shows that Pacific agreed to pay all the landscaping costs, a novel interpretation of the word "proportionate."

■■ The purchase and sale agreement referred to two site plans. These two site plans were part of the contract, since reference in a contract to extraneous writings renders them part of the agreement for indicated purposes. *Kilbourne-Park Corporation v. Buckingham*, Wyo., 404 P.2d 244 (1965); and *Maryland-National Capital*

*Park and Planning Commission v. Lynn,* 514 F.2d 829, 168 U.S.App.D.C. 407 (1975). The site plans were called Exhibit B and Exhibit C in the purchase and sale agreement. Each contained the notation:

"Landscaping and planting for the 'La-Belle's' project shall be furnished and installed by Pacific Cascade Corporation."

Busch says that this language can only be construed to mean that Pacific was required to perform all the necessary landscaping. The trial court was unpersuaded by this argument, and so are we. Exhibit B defines the LaBelle's site as that area which is shaded in on the site plan. It shows the LaBelle's site as a shaded area which does not go all the way to Ridge Road or to Lincoln Highway, and does not appear to include the berm area. Exhibit C is an alternate site plan which showed LaBelle's located in a different place and is not pertinent.

The reciprocal easement agreement says that the parking site is a common area, and that all record owners are responsible for caring for landscaped areas on the parking site. It does not mention the berm area. The documents taken together do not support the argument that Pacific agreed to landscape both the parking site and berm area. We agree with the trial judge that the contract was ambiguous, and we hold that a rational basis existed for the trial court's factual finding of the parties' intent concerning landscaping.

## II

The second part of this controversy involves a reciprocal easement agreement. The disputed provision reads:

"The respective owners of the PCC Site, the Parking Area Site and the BDI Site reserves [sic] and shall have the right, from time to time, without obtaining the consent or approval of the other owner of the Site, if any, to make any changes, modifications or alterations in its portion of its own site * * *; however, it being expressly understood that the accessibility of the respective sites to pedestrian and vehicular traffic is not unreasonably restricted thereby. The respective record owners * * * shall each have a right of approval of any material changes in the Parking Area Site, which approval shall not be unreasonably withheld."

The parking site is still owned in fee by Busch, but it is subject to this reciprocal easement agreement, which agreement provides that it will run with the land. Busch argues that the reciprocal easement agreement shows that Busch intended to reserve a right to develop pads, which are buildings and parking areas for the buildings, on the LaBelle's parking site. Pacific argues that the written agreements do not show that it intended to allow Busch to develop the parking lot area without approval by the record owners.

The basic purpose, once again, in interpreting or construing a contract is to determine the intention and understanding of the parties. If the contract is in writing and the language is clear and unambiguous, the intention is to be ascertained from the words of the contract. The contract as a whole is to be considered, with each part being read in light of all the other parts. *Amoco Production v. Stauffer Chemical,* supra. If the contract is ambiguous, however, resort may be had to extrinsic evidence. We again agree with the trial court's conclusion that the reciprocal easement agreement was ambiguous and that parol evidence could properly be admitted.

Paragraph A of the recitals of the Reciprocal Easement Agreement said that Busch was presently the owner of a parcel of land containing 31.96 acres, to be referred to as the "Total Site." Paragraph B of the recitals described the PCC site as consisting of 1.38 acres on which Pacific intended to construct and lease a retail catalogue showroom store. It also described a parcel of land consisting of approximately 6.84 acres as the parking site. Paragraph B also stated that Pacific intended to construct parking and related improvements on the parking site. Paragraph C of the recitals said that Busch from time to time intended to construct additional buildings and other improvements related thereto upon the re-

maining portion of the total site, which it called the BDI site. Paragraph D recited that to facilitate the aforesaid development, Busch intended by the reciprocal easement agreement to establish certain easements, agreements, rights and obligations with respect to the sites.

The reciprocal easement agreement, read as a whole, allows Busch to construct on what was the remaining BDI site (which was where the Kroh Brothers eventually built) without the consent of any of the other record owners. According to the recitals, however, Busch reserved no such right on the PCC site or on the parking site. We then see from the written agreement itself that Pacific agreed to let Busch develop the BDI site, but did not state a similar intention concerning the parking site. We could infer from the omission that Pacific had no such intention, or we could infer that Pacific had given the matter no thought, or we could infer that Pacific implicitly agreed to let Busch develop the parking site. For that reason, parol evidence was properly admitted.

Mr. Lane testified that he formed Pacific to develop commercial industrial properties throughout the country. The Lane Company was formed predominantly as a management organization. Lane developed a relationship with Modern Merchandising, LaBelle's parent company, and became custom builders for them. The evidence showed that Pacific, in its past dealings with LaBelle's, always agreed to supply them with at least 360 parking spaces for a 36,000 square foot building, the size of the one in Cheyenne. Mr. Lane stated that when they first discussed the project with Busch, Busch mentioned pads. However, at that time it was proposed that LaBelle's would be at the apex of an L-shaped center, instead of off to the far side. Mr. Lane testified that because of the tremendous amount of property in front of the apex of the center, pads by the street would not hurt them too much.[1] They did not feel

that way about the new location, though. Mr. Lane further testified that pads in the parking lot for the area where LaBelle's was eventually built were never discussed.

 Although the evidence was conflicting concerning who drafted the reciprocal easement agreement, Peterson of Pacific testified that an attorney for Busch prepared the final draft of the agreement from a copy Peterson sent him that Pacific had used in a transaction with someone else. Mr. Busch testified that he told his attorney to go ahead and work out the reciprocal easement agreement with Mr. Lane or his people. He also testified that basically he just left the matter with his attorney, although he did not specifically tell his attorney to draft it. Busch's attorney testified that he only "changed the players" for the agreement. However, a letter which Busch's attorney wrote to Peterson read: "Enclosed is an amended REA agreement which I modified as I thought best to reflect the realities of the Cheyenne Shopping Center." A meeting was then held, after which Busch's attorney again made changes in the reciprocal easement agreement. Considering the evidence in a light most favorable to Pacific, Busch's attorney drafted the easement agreement, so that it is to be construed most strongly against Busch. *Goodman v. Kelly*, supra.

 We see no reason to disturb the trial court's factual finding that Pacific did not intend to allow Busch to develop the parking area without Pacific's approval, and that the reciprocal easement agreement should be so construed.

 The trial court also properly determined that extrinsic evidence could be admitted to allow it to determine what the parties meant when they said that material changes in the parking area required the record owners' approval and to determine whether such approval was unreasonably withheld.

The trial court concluded:

1. There is a string of buildings at the shopping center which essentially makes up two sides of a diamond-shaped area. A building is located at the apex, which is at the southeast corner of the diamond. There are two pads at approximately the far side of the diamond, the northwest point. LaBelle's is located off to the west side, outside the diamond-shaped area.

" * * * [T]he construction of additional buildings in the parking area site and/or the development of 'outpads' constitutes a material change in the parking area site, requiring the approval of all the record owners of the PCC site." [2]

We have already noted that LaBelle's had required 360 parking spaces for buildings of similar size. Testimony was presented which showed that Busch intended to construct two buildings on the parking site, and that it intended to use some of the parking site which Pacific had constructed for LaBelle's. The testimony also showed that the proposed Busch buildings and parking spaces would take as much square feet as the LaBelle's building, and would leave only 295 parking spaces for LaBelle's. Further, Busch made no indication of just what sort of businesses would occupy the buildings, which could affect the amount and movement of traffic on the parking site, as well as the visibility of the LaBelle's store from the highway, both matters of concern to Pacific and Lane.

We agree that the construction of buildings in the parking area would constitute a material change which may not be accomplished without the approval of all the record owners. We also agree that Lane did not unreasonably withhold its approval.

Affirmed.

ROONEY, Justice, concurring.

I concur. However, I want to note that my concurrence does not reflect an acknowledgment of authority on the part of a planning or zoning agency to condition use on landscaping,[1] or to indicate that the word "landscaping" is sufficiently definite

to establish legal obligations with reference to that which is necessary to accomplish such.[2]

---

2. The trial court in its Supplemental Findings of Fact and Conclusions of Law found that at the time of the filing of the action and during its pendency, Pacific, Lane, and the Hendel group were record owners within the meaning of the reciprocal easement agreement; that Modern Merchandising, Inc. as lessee, and Banker's Life Company as the holder of the mortgage on the building may also have been record owners within the meaning of the reciprocal easement agreement. It also concluded that in view of its finding that parties who were

record owners withheld their approval based on good and sufficient reason, then Banker's Life Company and Modern Merchandising, Inc. were not necessary or indispensable parties for the purposes of Busch's complaint against Pacific, Lane, and the Hendel group.

1. Subdivision development may be subject to dedication of a certain percentage of land for parks or recreational purposes.

2. These issues were not presented in this case.