**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**November 22, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

MOUNTAIN WEST MINES, INC.,

      Plaintiff-Appellant,

v.

CLEVELAND-CLIFFS IRON
COMPANY, POWER RESOURCES,
INC., and PATHFINDER MINES
CORPORATION,

      Defendants-Appellees.

No. 05-8079

---

**Appeal from the United States District Court**
**for the District of Wyoming**
**(D.C. No. 04-CV-122-CAB)**

---

Patrick D. Frye, (Harold G. Morris, Jr., with him on the briefs) Lindquist &
Vennum, P.L.L.P., Denver, Colorado for the Plaintiff–Appellant.

David R. Hammon, Davis Graham & Stubbs LLP, Denver, Colorado (Stephen E.
Kapnik, Lohf Shaiman Jacobs Hyman & Feiger P.C., and Frank D. Neville, Scott
P. Klosterman, Williams, Porter, Day & Neville, P.C., Casper, Wyoming with him
on the briefs) for Defendants–Appellees.

---

Before **LUCERO**, **SILER**,[*] and **O'BRIEN**, Circuit Judges.

---

[*] The Honorable Eugene E. Siler, Jr., Senior Circuit Judge, United States
Court of Appeals for the Sixth Circuit, sitting by designation.

**LUCERO**, Circuit Judge.

Mountain West Mines, Inc. ("Mountain West") brought suit against Cleveland-Cliffs Iron Co. ("Cliffs"), Power Resources, Inc. ("Power"), and Pathfinder Mines Corp. ("Pathfinder") arguing it is owed royalty payments on uranium production under a series of contracts between Mountain West and Cliffs. With the facts undisputed, all parties moved for summary judgment. The district court denied Mountain West's motion, granted the defendants' joint motion, and ordered Mountain West to pay defendants' attorneys' fees. Mountain West appeals both the grant of summary judgment and the fee award. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we **AFFIRM** the grant of summary judgment, but **REVERSE** and **REMAND** for further proceedings on the award of attorneys' fees.

**I**

In 1967 Mountain West and Cliffs entered into an option and agreement ("Option") concerning property in Wyoming's Powder River Basin. Cliffs obtained the option to purchase Mountain West's uranium leases and mining rights in exchange for, inter alia, royalty payments on uranium production. The Option included a future acquisition clause covering the area of mutual interest ("AMI"):

> With respect to "other lands" and any and all lands acquired by
> "Mountain West" in the "Powder River Basin," . . . by lease or

- 2 -

otherwise after the date of this Option and Agreement, said lands will be assigned or deeded at "Cliffs" request . . . subject only to a two and one-half percent (2-1/2%) overriding royalty or reserved royalty to "Mountain West." . . . It is further understood and agreed that "Mountain West" will be entitled to and "Cliffs" agree [sic] to convey a two and one-half percent (2-1/2%) royalty interest to "Mountain West" in any lands it may hereafter acquire in the "Powder River Basin" . . . .

Additionally, the Option included an assignment clause:

This agreement shall not be assignable in whole or in part without the prior written notification to "Mountain West". [sic] Subject to the limitation herein the provisions hereof shall inure to the benefit of and shall be binding upon the successors in interest, legal representatives and assigns of the respective parties hereto . . . . Nothing herein contained and no assignment of this Option and Agreement shall be construed to relieve "Cliffs" of the obligation to . . . convey a two and one-half percent (2-1/2%) royalty interest to "Mountain West" of any lands acquired by it in the "Powder River Basin."

In 1968 Mountain West and Cliffs executed an addendum that extended Cliffs' rights under the Option for six months and clarified the parties' responsibilities. The addendum included the following clause (the "Getty Clause"):

With respect to all other persons, firms, corporations, or business entities including, but not limited to, Getty Oil Company acting on their own and independently of Cliffs, and not acquiring said lands from Cliffs. [sic] Mountain West recognizes their independent right to acquire lands and mining property in the Powder River Basin as defined in the Option and Agreement free and clear of any claim by Mountain West and Mountain West disclaims any right to a two and one-half percent (2-1/2%) royalty interest or any interest at all in lands acquired by such persons, corporations or other business entities.

- 3 -

Cliffs exercised its option in 1969, purchasing the mining rights to four properties: North Bing, Four Mile, North Butte, and Greasewood Creek (collectively the "Original Four"). In 1976 the parties executed an additional addendum clarifying the manner in which royalty payments would be computed. They agreed to the following language:

> The parties acknowledge and agree that the lands subject to the Option and Agreement are all the lands in the Powder River Basin, as it is defined in the Option and Agreement, in which Cliffs has acquired or hereafter acquires any Ore and/or Other Minerals. Cliffs will pay to Mountain West royalties as provided in this Addenda on all Ores and Other Minerals mined or produced from such lands by whomsoever.

Mountain West and Cliffs also entered into a deed and agreement reflecting the revised royalty rights. That deed states: "All provisions of this Deed and Agreement shall inure to the benefit of, and be binding upon, the successors in interest, legal representatives and assigns of the respective parties hereto . . . ."

In 1986 Cliffs sold the mining rights on the North Bing and Four Mile properties to the Central Electricity Generating Board ("CEGB"). The purchase agreement in this transaction noted that the properties were "encumbered by certain royalty and other obligations, including the royalty and other obligations as described in the Option and Agreement between Cliffs and Mountain West Mines, Inc." Cliffs also warranted in deeds and assignments that CEGB "does not share or take any responsibility of [Cliffs] to pay a mineral production royalty to

- 4 -

[Mountain West] from property other than the Subject Property." CEGB sold its rights in these two properties to Power in 1996.

In 1987 Cliffs sold its North Butte and Greasewood Creek mining rights to Uranerz U.S.A., Inc. ("Uranerz"). In this purchase agreement, Cliffs disclosed both the AMI clause and the royalty obligation: "Any land Cleveland-Cliffs should acquire for uranium exploration and mining within a very large area of interest falls under [the Option] . . . . The only monetary obligation to [Mountain West] that remains is a production royalty, and this goes with the two properties." The agreement further noted that "[i]n general, provisions in the [Option] follow land sold by Cleveland-Cliffs." Additionally, the Cliffs-Uranerz deeds included the same warranty used in the Cliffs-CEGB transaction, stating that the buyer would only be responsible for royalties on the subject property. When Uranerz sold its interest in these properties to Pathfinder in 1991, it incorporated into the deed that same warranty limiting royalty payments to the subject property. The Original Four were reunited in 2001 when Pathfinder sold its rights in North Butte and Greasewood Creek to Power.

All parties agree that Mountain West is due royalties from production on the Original Four. This litigation concerns the responsibility for royalty payments on two other mining properties in the AMI, the Highlands Uranium Project and the Smith Ranch (collectively "Highlands Properties"), in which neither Mountain West nor Cliffs has ever held an interest.

Power acquired a 74.25% interest in the Highlands Uranium Project in 1989. Pathfinder purchased a 25% interest in the Project in 1992, while it owned mining rights on the North Butte and Greasewood Creek properties, but later sold this interest. In 2002, while Power owned mining rights on all of the Original Four, it purchased the remaining 25.75% interest in the Highlands Uranium Project, as well as the nearby Smith Ranch.

## II

We review the grant of summary judgment de novo, applying the same legal standard employed by the district court. Sequoyah County Rural Water Dist. No. 7 v. Town of Muldrow, 191 F.3d 1192, 1196 (10th Cir. 1999). Summary judgment is appropriate only where there is no genuine issue of material fact and one party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The parties do not dispute the underlying facts, limiting our analysis to whether the district court correctly applied the law. Wolf v. Prudential Ins. Co. of Am., 50 F.3d 793, 796 (10th Cir. 1995). Because the district court exercised diversity jurisdiction under 28 U.S.C. § 1332(a) and the events at issue occurred in Wyoming, we apply the substantive law of that state. Erie R.R. Co. v. Tompkins, 304 U.S. 64 (1938).

## A

Mountain West argues that the district court erred in determining that the after-acquired property clause was not a covenant running with the land. Under

Wyoming law, a party seeking to establish a covenant running with the land must prove four elements: "a. The original covenant must be enforceable; b. The parties to the original covenant must intend that the covenant run with the land; c. The covenant must touch and concern the land; and d. There must be privity of estate between the parties." Jackson Hole Racquet Club v. Teton Pines, 839 P.2d 951, 956 (Wyo. 1992); see also North Finn v. Cook, 825 F. Supp. 278, 282 n.8 (D. Wyo. 1993).

The parties agree that the series of agreements between Mountain West and Cliffs were initially enforceable. We turn then to the second prong of the covenant determination: whether Mountain West and Cliffs intended the after acquired property clause to run with the land.

Covenants are "contractual in nature" and must be construed according to the principles of contract law. Stevens v. Elk Homeowners' Ass'n, 90 P.3d 1162, 1165-66 (Wyo. 2004). Wyoming's general rules of contract interpretation were reiterated in Wyo. Game & Fish Comm'n v. Mills Co., 701 P.2d 819, 822 (Wyo. 1985):

> Our basic purpose in construing or interpreting a contract is to determine the intention and understanding of the parties. If the contract is in writing and the language is clear and unambiguous, the intention is to be secured from the words of the contract. And the contract as a whole should be considered, with each part being read in light of all other parts.

Id. at 822 (quoting Cheyenne Mining and Uranium Co. v. Fed. Res. Corp., 694 P.2d 65, 70 (Wyo. 1985)). In construing the intent of the parties, "common sense and good faith are the leading characteristics of contract construction." Busch Dev. v. Cheyenne, 645 P.2d 65, 69 (Wyo. 1982). However, because covenants restrict the use of land, they are "to be strictly construed, will not extend by implication, and in case of doubt the restrictions will be construed in favor of the free use of the land." Jackson Hole, 839 P.2d at 956.

Mountain West asserts that the intent of the parties to bind Cliffs' successors is manifested by the combination of the after acquired property clause and the assignment clause in the Option. Reading those clauses together provides a fairly compelling argument: "'Cliffs' agree [sic] to convey a two and one-half percent (2-1/2%) royalty interest to 'Mountain West' in any lands it may hereafter acquire in the 'Powder River Basin'" and "the provisions hereof shall inure to the benefit of and shall be binding upon the successors in interest, legal representatives and assigns of the respective parties hereto." However, just as the parties found the original Option insufficient for their purposes, our analysis must continue to their subsequent addenda. See Slane v. Curtis, 269 P. 31, 33 (Wyo. 1928) (holding that multiple instruments concerning the same transaction are to be construed as one instrument).

The Getty Clause, in the 1968 addendum, conclusively settles the intent issue:

- 8 -

With respect to all other persons, firms, corporations, or business entities including, but not limited to, Getty Oil Company acting on their own and independently of Cliffs, and not acquiring said lands from Cliffs. [sic] Mountain West recognizes their independent right to acquire lands and mining property in the Powder River Basin as defined in the Option and Agreement free and clear of any claim by Mountain West and Mountain West disclaims any right to a two and one-half percent (2-1/2%) royalty interest or any interest at all in lands acquired by such persons, corporations or other business entities.

Power and Pathfinder certainly qualify as "other . . . corporations" under the terms of this clause. Similarly, the Highlands Properties are undoubtedly "lands and mining property in the Powder River Basin" that were not acquired from Cliffs. The only remaining question is whether Power and Pathfinder acquired the Highlands Properties while "acting on their own and independently of Cliffs." If they did, then "Mountain West disclaims any right to a two and one-half percent (2-1/2%) royalty interest or any interest at all" in those lands – the very interest they assert in this case.

Mountain West urges us to construe "independently" to require a complete absence of any connection whatsoever. They contend that any company holding title to property acquired from Cliffs is not independent of Cliffs. Under this strained reading, it is unclear how the Getty Clause could ever take effect. A company cannot become bound by the after acquired property clause except by obtaining property from Cliffs, but Mountain West would have us hold that any company obtaining such property is no longer independent of Cliffs. Such a

reading violates the presumption that every provision of a contract is "placed there for a purpose." Wyo. Game & Fish Comm'n, 701 P.2d at 822.

Mountain West's construction also defies the common understanding of "independent." See Amoco Prod. Co. v. EM Nominee P'ship, 2 P.3d 534, 540 (Wyo. 2000) ("According to our established standards for interpretation of contracts, the words used in the contract are afforded the plain meaning that a reasonable person would give to them."). To act "independently" is to act in an independent manner. In customary usage, "independent" means not controlled by, or affiliated with, another. Mountain West does not allege that Cliffs ever had a joint venturer, partner, or parent-subsidiary relationship with either Power or Pathfinder. Nor is there any indication that Cliffs attempted to evade the after acquired property clause by creating a new entity to hold its interests. Power and Pathfinder are each independent of Cliffs according to the ordinary meaning afforded that term.

The assignment clauses appearing in subsequent agreements do not change the fact that Mountain West expressly disclaimed its interest in asserting the after acquired property clause against Cliffs' successors. Those clauses simply extend the terms of the Option, as modified by the Getty Clause, to subsequent purchasers of the Original Four.

Nor does the following clause in the 1976 addendum requires Cliffs' successors to pay royalties on after acquired property:

The parties acknowledge and agree that the lands subject to the Option and Agreement are all the lands in the Powder River Basin . . . in which Cliffs has acquired or hereafter acquires any Ore and/or Other Minerals. Cliffs will pay to Mountain West royalties as provided in this Addenda on all Ores and Other Minerals mined or produced from such lands by whomsoever.

By its own terms this clause does not apply to the Highlands Properties, in which Cliffs never acquired any ore or property interest whatsoever.

Similarly, Cliffs' disclosure of its obligations under the Option in its deeds to CEGB and Uranerz did nothing to eliminate or even limit operation of the Getty Clause. Each of those deeds warranted that the grantee "does not share or take any responsibility of [Cliffs] to pay a mineral production royalty to [Mountain West] from property other than the Subject Property." Even without those warranties, the deeds and purchase agreements do not evince any intent to revive the royalty obligations Mountain West expressly disclaimed in the Getty Clause.

Mountain West has failed to establish that the "parties to the original covenant . . . intend[ed] that the covenant run with the land." Jackson Hole, 839 P.2d at 956. Because a party must prove each of the four elements of a restrictive covenant, the failure to establish intent is fatal to Mountain West's claim.[1]

---

[1] Because the Jackson Hole test is conjunctive, we need not reach the remaining elements in rejecting Mountain West's restrictive covenant claim. See Jackson Hole, 839 P.2d at 956.

Accordingly, we hold that the after acquired property clause is not a covenant running with the land.

**B**

To the extent that Mountain West asserts a cause of action under contract law against Power and Pathfinder, we reject that claim as well. It is undisputed that Mountain West never entered into any agreement with either Power or Pathfinder. As a general matter, a party is not liable for "an obligation under a contract except by his consent." Lingle Water Users' Ass'n v. Occidental Bldg. & Loan Ass'n, 297 P. 385, 387 (Wyo. 1931). There are few exceptions to this rule. The primary example is the covenant running with the land which, as discussed in Section II.A, supra, is not applicable to the after acquired property clause.

A second possibility is voluntary assumption; however, that too is inapposite. Both CEGB and Uranerz, the predecessors in interest to Power and Pathfinder respectively, expressed in their deeds that they did not "share or take any responsibility of [Cliffs] to pay a mineral production royalty to [Mountain West] from property other than the Subject Property." Mountain West argues that Power and Pathfinder assumed the after acquired property clause "by implication," but neither cites authority endorsing such a broad notion of contract liability nor provides a compelling rationale to deviate from Wyoming's general rule as set forth in Lingle.

Finally, Mountain West has no claim against Cliffs for deeding the Original Four to CEGB and Uranerz free of the after acquired property obligation. As discussed at length in Section II.A, <u>supra</u>, the Getty Clause removed any obligation Cliffs' successors may have had to pay royalties on after acquired property in the AMI.

**III**

The district court ordered Mountain West to pay appellees' costs and fees. Although federal courts have the inherent power to award fees, <u>Alyeska Pipeline Serv. Co. v. Wilderness Soc'y</u>, 421 U.S. 240, 259 (1975), such awards are appropriate "only in exceptional cases and for dominating reasons of justice." <u>Cornwall v. Robinson</u>, 654 F.2d 685, 687 (10th Cir. 1981) (quotation omitted). When a party acts "in bad faith, vexatiously, wantonly, or for oppressive reasons," a court may properly depart from the traditional American rule disfavoring fee awards. <u>Sterling Energy, Ltd. v. Friendly Nat'l Bank</u>, 744 F.2d 1433, 1435 (10th Cir. 1984) (quotation omitted). This Circuit sets a high bar for bad faith awards, "otherwise those with colorable, albeit novel, legal claims would be deterred from testing those claims in a federal court." <u>Id.</u> (quoting <u>Browning Debenture Holders' Comm. v. DASA Corp.</u>, 560 F.2d 1078, 1088 (2d Cir. 1977)). Accordingly, "we have insisted that a trial judge make a finding of bad intent or improper motive." <u>Id.</u> at 1437.

The district court made no explicit finding of bad faith, but it did state: "It astounds the Court that Mountain West asserts that it is owed royalty payments on land which it has never owned by companies with which it has never entered into a contract or agreement." Mountain West's claims may have stretched the bounds of reason, but they revolved around numerous contracts, addenda, purchase agreements, and deeds spread over almost forty years, as well as the law of servitudes, of which one commentator states:

> The law in this area is an unspeakable quagmire. The intrepid soul who ventures into this formidable wilderness never emerges unscarred. Some, the smarter ones, quickly turn back to take up something easier like the income taxation of trusts and estates. Others, having lost their way, plunge on and after weeks of effort emerge not far from where they began, clearly the worse for wear. On looking back they see the trail they thought they broke obscured with foul smelling waters and noxious weeds. Few willingly take up the challenge again.

E. Rabin, Fundamentals of Modern Real Property Law 489 (1974).

Although a claim may be "so frivolous as to reflect impermissible conduct," Rutledge v. Sunderland, 671 F.2d 377, 382 (10th Cir. 1982) (quoting Americana Indus. v. Wometco de Puerto Rico, Inc., 556 F.2d 625, 628 (1st Cir. 1977)), the present matter falls into the much larger category of cases in which a finding of subjective wrongdoing is required to support a fee award. Rather than reverse the fee award outright, we remand to the district court to determine whether Mountain West indeed possessed such improper motives.

**IV**

Because Mountain West expressly disclaimed the interest it now seeks to vindicate, we **AFFIRM** the dismissal of its claims and the district court's grants of summary judgment on appellees' counterclaims.  However, because the district court made no finding of bad faith we **REVERSE** the award of attorneys' fees and costs, and **REMAND** for further proceedings on that issue.